UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ASHTON ARNIZE SMITH,

                Petitioner,

                                    Case No. 16-14513
v.                                  Honorable Linda V. Parker

SHAWN BREWER,

                Respondent.

_____/

## OPINION AND ORDER (1) DENYING THE PETITION FOR WRIT OF HABEAS CORPUS; (2) DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY; BUT (3) GRANTING LEAVE TO APPEAL IN FORMA PAUPERIS

Petitioner Ashton Arnize Smith ("Petitioner"), confined at the Cotton Correctional Facility in Jackson, Michigan, has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is challenging his Michigan convictions for second degree murder in violation of Michigan Compiled Laws § 750.317, assault with intent to do great bodily harm less than murder in violation of Michigan Compiled Laws § 750.84, and felony-firearm in violation of Michigan Compiled Laws § 750.227b. For the reasons that follow, the Court is denying Petitioner habeas relief and a certificate of appealability, but granting him leave to proceed in forma pauperis on appeal.

## I. Background

Petitioner's convictions arose from a shooting that occurred in the early morning hours of August 30, 2008, at a townhouse in Detroit, Michigan. Tremaine Johnson and Ashley Wilson lived at the townhouse, which was two stories with a kitchen and living and dining areas on the first floor and two bedrooms and a bathroom on the second floor. (3/1/10 Trial Tr. at 58, 61, 62, ECF No. 15-4 at Pg ID 510, 514, 515.) Johnson and Wilson had been friends since middle school. (*Id.* at 6, Pg ID 459.) They, along with another school friend, Keith Cooper, sold marijuana from the residence. (*Id*. at 10-11, Pg ID 464-65.)

Johnson, Wilson, and Cooper were at the townhouse the evening of August 29, 2008. Johnson went to sleep upstairs at around 10:00 p.m. (3/1/10 Trial Tr. at 65-66, ECF No. 15-4 at Pg ID 518-19.) Melvin Almond, Darryll Duckett, and Anthony Harris also came to the townhouse later that evening or in the early morning hours of August 30. They too were school friends with Johnson, Wilson, and Cooper.

At Petitioner's bench trial, Almond testified that he lived in the same complex as Johnson and went to Johnson's house at about 3:00 a.m. to finish washing clothes he had started earlier that day. (2/25/10 Trial Tr. at 51-53, ECF No. 15-3 at Pg ID 323-25.) Almond explained that he did not have a washer or dryer in the apartment he lived in with his mother, but Johnson allowed Almond to

use his machines.  (*Id.*)  Almond testified that he went directly into the basement, where the machines were located, when he arrived at Johnson's house.  (*Id.* at 54, Pg ID 326.)

About seven to eight minutes later, Almond returned to the first floor and walked toward the living room and adjacent dining room area.  (*Id.* at 55, 64, Pg ID 327, 336.)  On his way, Almond passed Petitioner in the hallway walking toward the kitchen and the stairs.  (*Id.* at 64-66, Pg ID 336-38.)  Almond testified that he did not know Petitioner.  (*Id.* at 66, pg ID 338.)  According to Almond, Petitioner had a wet towel draped over his head and was saying he was "high as hell."  (*Id.* at 64, Pg ID 336.)

Almond entered the dining room area, sat down in a chair, plugged his cell phone into the wall, and began texting.  (*Id.* at 67-68, Pg ID 339-40.)  He testified that Wilson was sitting in a chair next to the dining room table playing a video game on the television in the adjacent living room.  (*Id.* at 58-59, Pg ID 330-31.)  That same chair was overturned when the police arrived after the shooting.  (*Id.*)  Cooper and Duckett were sitting on the sectional couch in the living room.  (*Id.* 59-60, Pg ID 331-32.)  Harris was asleep on the couch.  (*Id.* at 63, Pg ID 335.)

Within minutes of Almond sitting down, he heard gunshots, looked up, and saw Petitioner coming towards him from the hallway with a gun in his extended hand.  (*Id.* at 69-70, Pg ID 341-42.)  Standing approximately ten to fifteen feet

away, Petitioner shot Almond in the upper right part of his chest. (*Id.* at 71-73, Pg ID 343-45.) From the ground where he fell, Almond saw Petitioner continue shooting in the direction of Wilson, Duckett, Cooper, and Harris. (*Id.* at 74-75, Pg ID 346-47.)

Almond described Wilson as trying to escape the gunfire, twisting his body left to move behind the entertainment system when he was shot by Petitioner. (*Id.* at 76, 80-81, Pg ID 348, 352-53.) Duckett was trying to open the patio sliding door and, realizing the glass had shattered, ran through the frame and away from the townhouse. (*Id.* at 83-84, Pg ID 355-56.) Almond saw Petitioner chase after Duckett. (*Id.*)

Almond then exited the townhouse through the front door, as did Wilson. (*Id.* at 85-86, Pg ID 357-58.) Almond saw Johnson jump off the townhouse roof and run across the street to seek help from a neighbor. (*Id.*) Almond ran down the street to his own apartment, and alerted his mother and his aunt that he had been shot. Almond's aunt then drove Almond, Wilson, and Johnson to the hospital.

Wilson died that day of a single gunshot wound to the right buttock, which exited the right abdomen area. (2/25/10 Trial Tr. at 49, Pg ID 321.) According to the medical examiner's report, there was no evidence of close range firing. (*Id.*) Wilson was twenty-years old. (*Id.*)

Almond testified that he did not see anyone but Petitioner with a gun inside the townhouse. (*Id.* at 91, Pg ID 363.) He further testified that he was unaware of the shotgun later found by police behind the couch in the living room and never saw anyone with it that evening. (*Id.* at 92, Pg ID 364.) According to Almond, his friends neither attacked nor made any aggressive movements toward Petitioner. (*Id.* at 93, Pg ID 365.)

Duckett's and Cooper's recitations of the incident at Petitioner's trial were similar to Almond's. Duckett provided that he and Harris went to Johnson's townhouse at around midnight or 1:00 a.m. and that Wilson and Almond also were there when the incident occurred. (*Id.* at 131, Pg ID 403.) According to Duckett, Petitioner (whom he had never met before) and "an acquaintance" came to the house. (*Id.* at 136, Pg ID 408.) Petitioner left the residence for ten to twenty minutes; and, when he returned, asked Wilson if he could use the bathroom. (*Id.* at 138, Pg ID 410.) Wilson told Petitioner it was upstairs and Petitioner left for about five minutes. (*Id.* at 138-39, Pg ID 410-11.)

Duckett testified that Petitioner then returned to the living and dining room area, pulled a pistol, and shot at Wilson and Almond. (*Id.* at 139, Pg ID 411.) Duckett explained that he did not actually see Petitioner take a second shot, because Duckett already had started running for the door. (*Id.* at 143-44, Pg ID 415-16.) Duckett ran out the back patio door and away from the townhouse. (*Id.*

at 143-47, Pg ID 415-419.)  Duckett testified that as he fled the premises, he saw

Petitioner follow him and play with the gun like it was jammed.  (*Id.* at 147-48, Pg

ID 419-20.)  Duckett then heard two more gunshots.  (*Id.*)

Duckett testified that no one argued with Petitioner before the shooting and

none of his friends struggled with Petitioner for the gun or grabbed the shotgun

during the entire episode.  (*Id.* at 152-54, Pg ID 424-26.)  Duckett indicated,

however, that Wilson showed Petitioner the shotgun sometime after he first arrived

at the townhouse, and allowed Petitioner to hold it.  (*Id.* at 161-62, Pg Id 433-34.)

Wilson told Petitioner he had just bought the shotgun and that it did not have any

bullets.  (*Id.*)  Petitioner then returned the shotgun to Wilson, who put it back

behind the sectional couch.  (*Id.* at 162, Pg ID 434.)  Duckett testified that Almond

was in the basement when this occurred.  (*Id.*)  According to Duckett, Petitioner

also bought a marijuana cigarette from Wilson and smoked it, sharing it with

Cooper.  (*Id.* at 164, Pg ID 436.)

At trial, Cooper did not recall when Petitioner arrived at the townhouse, but

he remembered Wilson letting him in.  (3/1/10 Trial Tr. at 20, ECF No. 15-4 at Pg

ID 473.)  According to Cooper, Petitioner asked if they wanted to smoke and he,

Wilson, and Petitioner did.  (*Id.* at 21, Pg ID 474.)

Cooper, who testified that he was drunk during the incident, only

remembered getting up and heading towards the kitchen when he saw Petitioner

coming out of the kitchen shooting a gun. (*Id.* at 23-24, Pg ID 476-77.) Cooper

ran out the front door after hearing one gunshot. (*Id.* at 29-30, Pg ID 482-83.)

Petitioner testified that he went to Johnson's house at around 2:00 a.m. on

August 30, in order to sell him some Cartier glasses to get money for a hotel room

after his "lady friend" kicked him out of her house. (3/4/10 Trial Tr. at 68-69, Pg

ID 611-62.) According to Petitioner, Johnson had offered to buy the glasses a

week or so earlier. (*Id.*) Petitioner knew Johnson from the neighborhood and had

purchased drugs from him before. (*Id.* at 67, Pg ID 610.)

When Petitioner arrived at the townhouse, Wilson let him in the front door.

(*Id.* at 69, Pg ID 612.) Petitioner testified that he knew Wilson because Wilson

sold marijuana with Johnson. (*Id.*) According to Petitioner, Cooper, Duckett, and

Almond were at the house when he arrived, as well as a guy asleep on the couch.

(*Id.* at 69, Pg ID 612.) Petitioner described the individuals as occupying the same

positions in the two rooms as Almond provided during his testimony. (*Id.* at 73-

74, Pg ID 616-17.) According to Petitioner, the shotgun was standing up behind

the sectional couch when he arrived. (*Id.* at 75, Pg ID 619.)

Petitioner told Wilson why he was there and asked for Johnson, but Wilson

said he was asleep. (*Id.* at 69-70, Pg ID 612-13.) Petitioner testified that Wilson

asked to see the glasses and Petitioner handed them to him. (*Id.* at 70, Pg ID 613.)

Petitioner told Wilson the glasses were worth $1,700, but he bought them on the

street for $300 and that was all he wanted for them.  (*Id.* at 71, Pg ID 614.)  Wilson

offered Petitioner drugs in lieu of cash, but Petitioner declined saying he needed

money to pay for a place to stay for the night.  (*Id.*)

Petitioner testified that Wilson then asked if he wanted to smoke a marijuana

blunt with him, and Petitioner said yes.  (*Id.* at 76, Pg ID 619.)  After they and

Almond took hits from the blunt, Petitioner asked Wilson again if he was

interested in buying the glasses.  (*Id.*)  Wilson said he only could give Petitioner

marijuana and cocaine for them.  (*Id.*)  Petitioner then asked Wilson to use the

bathroom.  (*Id.* at 78, Pg ID 621.)

Petitioner testified that when he returned from using the bathroom, Duckett

was in the hallway near the basement door and Almond was standing near a table

in the dining room.  (*Id.*)  According to Petitioner, Wilson then walked up to him

with a pistol in his hand and told him "to check them glasses in."  (*Id.*)  Wilson

then put the gun about an inch from Petitioner's chest and took the glasses off his

face and passed them to Duckett or Cooper.  (*Id.* at 78, 82, Pg ID 621, 625.)

Petitioner "attacked" Wilson for the gun and they began to struggle for it, with

Petitioner eventually disarming Wilson.  (*Id.* at 82, Pg ID 625.)

Petitioner testified that he then was going to run out the front door but

worried that someone would grab the shotgun and shoot him.  (*Id.* at 82-83, Pg ID

625-26.)  He claimed that he then saw Wilson run toward the shotgun and so he

shot Wilson.  (*Id.* at 83-84, Pg ID 626-27.)  Petitioner testified that Almond then

went for the shotgun, so he shot him too.  (*Id.* at 84, Pg ID 627.)

Petitioner testified that he then was going to run out the front door, but

thought that Johnson's friends in the neighborhood might have heard the gunshots,

would be looking outside, and would come after him if they saw him running

away.  (*Id.* at 85, Pg ID 628.)  Petitioner therefore decided to run out through the

back patio door.  (*Id.* at 86, Pg ID 629.)  He first grabbed his glasses from Cooper's

hands and shot twice at the glass of the door.  (*Id.* at 86, Pg ID 629.)  Petitioner

testified that he then threw the gun down inside the house and fled.  (*Id.* at 86-87,

Pg ID 629-30.)

Petitioner went to his girlfriend's house (different from his lady friend) and

stayed there for the night.  (*Id.* at 87-88, Pg ID 630-31.)

Almond, Duckett, and Cooper testified that they did not see Petitioner

wearing glasses at the time of the incident.  (2/25/10 Trial Tr. at 92, 153, ECF No.

15-3 at Pg ID 364, 425; 3/1/10 Trial Tr. at 38, ECF No. 15-4 at Pg ID 491.)  When

asked, Almond testified that he also did not hear anyone talking to Petitioner

regarding glasses.  (2/25/10 Trial Tr. at 92, ECF No. 15-3 at Pg ID 364.)

When the police searched the townhouse shortly after the shooting, they

found several casings from a 9 mm gun in the living and dining room area.

(2/25/10 Trial Tr. at 19-20, ECF No. 15-3 at Pg ID 290-93.)  The only firearm

found in the residence was a shotgun next to the sectional. (*Id*. at 23-24, Pg ID 295-96.) The shotgun was not loaded and no ammunition was found in the townhouse. (*Id*.)

After the shooting, Petitioner did not go to the police claiming that he was assaulted or robbed at Johnson's house. (3/4/10 Trial Tr. at 108, ECF No. 15-5 at Pg ID 651.) Detroit Police Officers showed Almond, Cooper, and Duckett photo arrays from which they identified Petitioner as the shooter. (2/25/10 Trial Tr. at 88-89, 151-52, ECF No. 15-3 at Pg ID 360-61, 423-24; 3/4/10 Trial Tr. at 49-50, 58-60, ECF No. 15-5 at Pg ID 592-93, 602.) Officers issued an arrest warrant for Petitioner and he was arrested several months later. (3/4/10 Trial Tr. at ECF No. 15-5 at 60, 62, Pg ID 603, 605.) He subsequently was charged with first-degree murder, two counts of assault with intent to commit murder, and felony-firearm.

A bench trial ensued before Judge Vonda R. Evans in the Wayne County Circuit Court on February 25 and March 1-5, 2010. On March 5, 2010, Judge Evans pronounced Petitioner guilty of the lesser offenses of second-degree murder and assault with intent to do great bodily harm less than murder and felony-firearm. In her oral ruling, Judge Evans rejected Petitioner's self-defense claim, but found a lack of evidence of specific intent to kill, stating:

> First of all, the Court has to look at whether or not the
> defendant acted in reasonable self-defense. The People have to show
> that the defendant—the defendant does not have to prove that he acted
> in self-defense, the prosecutor must prove, beyond a reasonable doubt,

10

that the defendant did not act in self-defense.  Clearly, the defendant did not act in self-defense.

The Court believes that at the time the evidence shows that, and I'm going to find, that Ashley Wilson did have gun; that when he took that gun from Ashley, he disarmed him—and I do believe that there was a gun that was there and that he took it—that he no longer had an honest and reasonable belief that in fact he was in danger of losing his life.  The fact of the matter is that you've got one person on the couch that's asleep, all during this situation, to the point that the police had to wake him up.  We've got Mr. Cooper that admits that he was drunk.

Then we have the testimony of Mr. Almond and Mr. Duckett.  But, at the same time, the Court has to look at the fact that these were Ashley's friends.

Do I believe that—and so, once he disarms him, there is no danger.  There is no danger.  However, I believe, at that point in time, the defendant was angry that in fact this weapon had been pulled out.  He took the weapon.  And I believe, based on the location of the injury of Mr. Wilson, that there was not an intent to kill.  He was struck in the buttocks, not several times, but one time.  Unfortunately, that was a fatal shot.

Mr. Duckett indicated—I'm sorry—Mr. Almond indicated that he was about ten to fifteen feet away, and he shot him, and he fell to the ground.

We know, by the testimony, I mean by the evidence, that it corroborates the area in which this did occur, from looking at the diagram and sketches.  The Court does not believe that even though he was shot in the chest, the Court does not believe that he had the specific intent to kill him, to murder him.  The Court does in fact find, beyond a reasonable doubt, that he had the specific—that he had the intent to cause great bodily harm.

As to Mr. Duckett, the Court is going to indicate, based on Mr. Duckett's testimony—he said that the gun jammed; that the defendant then tried to shoot at him; that he was able to get out of the location;

and that the gun jammed, and that he was about five to ten yards away, which is considerable.

I'm going to find the defendant—I don't believe that the People have proved that element. So, as to count three, the Court is going to find the defendant not guilty.

(3/5/100 Trial Tr. at 30-32, ECF No. 15-6 at Pg ID 686-88.)  The trial court subsequently sentenced Petitioner to terms of imprisonment of 230 months to 30 years for the second-degree murder convictions, 2 to 10 years for the assault convictions, and a consecutive 2-year term for the felony-firearm conviction.

Petitioner's convictions were affirmed on direct appeal. *People v. Smith*, No. 298157, 2012 WL 164098 (Mich. Ct. App. Jan. 19, 2012); *lv. den.* 815 N.W. 2d 431 (Mich. 2012).  Petitioner filed his pending application for federal habeas relief on December 27, 2016.[1]

Petitioner raises the following grounds in support of his request for habeas relief:

---

[1] Although the petition was untimely under the limitations period set forth in the Antiterrorism and Effective Death Penalty Act of 1996, Petitioner filed a motion for equitable tolling with his application for habeas relief.  (*See* ECF No. 27, 2016.)  The Court denied the motion without prejudice on April 4, 2017, finding the motion premature as Respondent had not yet answered the petition and raised the statute of limitations as a defense.  (ECF No. 10.)  Respondent thereafter filed a motion to dismiss based on statute of limitations grounds.  (ECF No. 11.)  The Court denied the motion on December 4, 2017, finding genuine issues of material fact with respect to whether Petitioner was entitled to equitable tolling and concluding that it would be more efficient to adjudicate the merits of his claims. (ECF No. 13.)

I. Was the ruling by the trial court that there was no basis for a claim of self-defense against the great weight of the evidence?

II. Should the trial court have granted a verdict of manslaughter on the grounds that the killing occurred in the heat of passion before adequate time to cool had occurred?

III. Mr. Smith is entitled to a new trial where trial counsel rendered ineffective assistance in the violation of state and federal constitutions.

IV. Mr. Smith's state and federal constitutional rights were violated when trial counsel failed to raise a likely meritorious defense.

V. Offense variable 13 was improperly scored resulting in an inappropriately inflated sentencing guidelines range. Mr. Smith's state and federal constitutional due process rights to be sentenced on accurate information were thus denied. Further, trial counsel rendered ineffective assistance at sentencing.

(Pet. at 3, ECF No. 1 at Pg ID 3.)

## II.  Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA"), imposes the following standard of review for

habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)     resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.

A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11. "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). To obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*, at 103. A habeas petitioner should be denied relief as long as

it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *See Woods v. Etherton*, 136 S. Ct. 1149, 1152 (2016).

### III.    Discussion

### A.    Petitioner's great weight/insufficiency of the evidence claims

In his first claim, Petitioner argues that the verdict was against the great weight of the evidence.  He also contends that there was insufficient evidence to disprove his self-defense claim.  In his second claim, Petitioner argues that he should have been found guilty only of voluntary manslaughter because the prosecution failed to prove beyond a reasonable doubt that he was not acting under an adequate provocation that would mitigate the murder charge to manslaughter.

A federal habeas court cannot grant habeas relief on a claim that a state conviction is against the great weight of the evidence.  *Riley v. Warden, Noble Corr. Inst.*, No. 2017 WL 3597424, at *3 (6th Cir. Feb. 24, 2017) (citing *Nash v. Eberlin*, 258 F. App'x 761, 764 n.4 (6th Cir. 2007) ("A manifest-weight claim is a matter of state law and not cognizable on habeas review.").  Courts, however, generally interpret such a claim as raising an insufficiency-of-the-evidence argument when construing pro se habeas petitioners' applications liberally, as they must.  *See, e.g., Nash*, 258 F. App'x at 764 n.4.  An insufficiency-of-the-evidence claim does not warrant habeas relief if "'after viewing the evidence in the light

most favorable to the prosecution, any rational trier of fact could have found the essential elements of the criminal offense beyond a reasonable doubt,' with 'explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Riley*, 2017 WL 3597424, at *3 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 324 n.16 (1979)).

The Court first turns to Petitioner's claim that the prosecutor failed to disprove his self-defense claim. Under Michigan law, "one acts lawfully in self-defense if he honestly and reasonably believes that he is in danger of serious bodily harm or death, *People v. Heflin*, 434 Mich. 482, 456 N. W.2d 10 (1990), as 'judged by the circumstances as they appeared to the defendant at the time of the act.'" *Blanton v. Elo*, 186 F.3d 712, 713 n.1 (6th Cir. 1999) (quoting Mich. Std. Crim. Jury Instr. 2d 7.15(3)). "A defendant is not entitled to use any more force than is necessary to defend himself." *People v. Kemp*, 508 N.W.2d 184,187 (Mich. Ct. App. 1993), abrogated on other grounds in *People v. Reese*, 815 N.W.2d 85 (Mich. 2012). In Michigan the prosecution bears the burden of proving the absence of self-defense when raised by a defendant. *Paprocki v. Foltz*, 869 F.2d 281, 282 (6th Cir. 1989) (citing *Berrier v. Egeler*, 583 F.2d 515, 521 (6th Cir. 1978)).

Nevertheless, Petitioner's claim that the prosecution failed to disprove his self-defense claim is not cognizable on habeas review. Under Michigan law, self-defense is an affirmative defense. *See Christian v. Romanowski*, No. 17-1279,

2017 WL 4083632, at *3 (6th Cir. Aug. 25, 2017); *see also People v. Dupree*, 788 N.W.2d 399, 404 (Mich. 2010). "'[P]roof of the nonexistence of all affirmative defenses has never been constitutionally required[.]'" *Smith v. United States*, 568 U.S. 106, 110 (2013) (quoting *Patterson v. New York*, 432 U.S. 197, 210 (1977)). "[T]he due process 'sufficient evidence' guarantee does not implicate affirmative defenses, because proof supportive of an affirmative defense cannot detract from proof beyond a reasonable doubt that the accused had committed the requisite elements of the crime." *Caldwell v. Russell*, 181 F.3d 731, 740 (6th Cir. 1999), abrogated on other grounds by *Wogenstahl v. Mitchell*, 668 F.3d 307 (6th Cir. 2012); *see also Gilmore v. Taylor*, 508 U.S. 333, 359 (1993) (Blackmun, J., dissenting) (citing *Martin v. Ohio*, 480 U.S. 228, 233-36 (1987)) ("In those States in which self-defense is an affirmative defense to murder, the Constitution does not require that the prosecution disprove self-defense beyond a reasonable doubt"); *Allen v. Redman*, 858 F.2d 1194, 1197 (6th Cir. 1988) (explaining that habeas review of sufficiency-of-the-evidence claims is limited to elements of the crimes as defined by state law).

Even if Petitioner's claim that the prosecutor failed to disprove his affirmative defense of self-defense was cognizable on habeas review, it does not entitle him to relief. This is because the Michigan Court of Appeals' rejection of Petitioner's claim was neither contrary to nor an unreasonable application of

clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Nevertheless, the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is, "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 318. "[T]his inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id*. at 318-19 (emphasis in original) (quoting *Woodby v. INS*, 385 U.S. 276, 282 (2010)). "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*. at 318-19 (emphasis in original) (citation omitted). This standard applies to jury trials, as well as bench trials. *See, e.g., United States v. Bronzino*, 598 F. 3d 276, 278 (6th Cir. 2010).

"[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011). Instead, the federal

18

court may grant habeas relief "only if the state court decision was 'objectively unreasonable.'" *Id.* (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Id.* Therefore, for a federal habeas court reviewing a state court's sufficiency-of-the-evidence evaluation, "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 566 U.S. 650, 656 (2012).

The Michigan Court of Appeals rejected Petitioner's sufficiency-of-the-evidence claim regarding self-defense, reasoning:

> Here, defendant testified that Wilson threatened to shoot him, but that defendant quickly disarmed Wilson. The trial court accepted defendant's testimony, but did not believe that either Wilson or Almond then reached for a shotgun. The prosecution's witnesses testified that no one in the house made any threats to defendant and that no one rushed toward the shotgun. Almond further testified that he never threatened defendant and that he did not have a gun. The trial court ruled that, after he disarmed Wilson, defendant was no longer in imminent danger and that he did not act in self-defense . It is well established that the trier of fact is in the best position to evaluate the credibility of witnesses before it. Further, it is for the trier of fact to determine what inferences can be fairly drawn from the evidence and to determine the weight to be accorded to the inferences. In light of the great deference given to the trial court's credibility assessments, and in light of other supporting testimony, the trial court did not clearly err in rejecting defendant's testimony that Wilson and Almond reached for a shotgun and that defendant shot them in self-defense.

*Smith*, 2012 WL 164098, at *1 (internal citations omitted). In light of the evidence presented at Petitioner's trial, this "finding was [not] so insupportable as to fall below the threshold of bare rationality." *See Coleman*, 566 U.S. at 656.

The Court next turns to Petitioner's claim that there was insufficient evidence presented to sustain his conviction for second-degree murder. Petitioner argues that there was insufficient evidence because the prosecution failed to prove beyond a reasonable doubt that he did not kill the victim in the heat of passion that was caused by an adequate provocation.

Under Michigan law, the elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse. *See Stewart v. Wolfenbarger*, 595 F.3d 647, 654 (6th Cir. 2010) (citing *People v. Goecke*, 579 N.W.2d 868, 878 (Mich. 1998)). "Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id.* (citing *People v. Aaron*, 728, 299 N.W.2d 304, 326 (Mich. 1980)). Provocation is not an element of second-degree murder. As set forth above, habeas review of a sufficiency-of-the-evidence claim is limited to reviewing the elements of the crime as defined by state law. *See supra*.

Moreover, the state court's conclusion that Petitioner was not acting under the heat of passion when he shot Wilson was not an unreasonable determination of the facts presented at trial.

For these reasons, the Court concludes that Petitioner is not entitled to habeas relief based on the first and second grounds asserted in his application.

**B.      Petitioner's ineffective assistance of counsel claims**

In his third and fourth grounds for relief, Petitioner asserts that his trial counsel was ineffective. Specifically, Petitioner argues that his trial counsel was ineffective for failing to object to inadmissible hearsay or opinion testimony from prosecution witnesses. He further argues that counsel was ineffective by failing to secure and review a copy of his presentence investigation report prior to the day of sentencing and review and discuss the report with Petitioner prior to sentencing.

To establish an ineffective-assistance claim, a habeas petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness" and that he suffered prejudice as a result. *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). There is "a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Id*. at 689. Habeas review also mandates the application of a second layer of deference: a habeas court analyzes only whether the state court was reasonable in its determination that counsel's performance was adequate. *See Burt*

*v. Titlow*, 571 U.S. 12, 15, 24 (2013); *Abby v. Howe*, 742 F.3d 221, 226 (6th Cir. 2014).

The Michigan Court of Appeals rejected Petitioner's ineffective assistance claim premised on counsel's failure to object to evidence, finding that the complained of evidence was not hearsay and was admissible because it was based on the personal observations of the witnesses. *Smith*, 2012 WL 164098, at * 4.

Federal habeas courts "'must defer to a state court's interpretation of its own rules of evidence and procedure' when assessing a habeas petition." *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir. 2005) (quoting *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988)). As such, this Court must defer to the Michigan Court of Appeals' determination regarding the admissibility of the testimony Petitioner claims his attorney should have objected to. If the testimony was admissible, as the state court held, this Court cannot find that Petitioner's counsel was ineffective for failing to object to it. *See Davis v. Straub*, 430 F.3d 281, 291 (6th Cir. 2005) ("Because we cannot logically grant the writ based on ineffective assistance of counsel without determining that the state court erred in its interpretation of its own law, we are constrained to uphold the district court's denial of the writ.").

In his fourth claim, Petitioner argues that his trial counsel was ineffective for failing to present an insanity defense and a duress defense. The Michigan Court of Appeals rejected Petitioner's first argument, finding "no evidence show[ing] that

defendant was legally insane when he committed the charged offense, and nothing in the record support[ing] his claim that he had a meritorious insanity defense." *Smith*, 2012 WL 164098, at \*5. The state court indicated that Petitioner provided no affidavits or documentation to show that "he had any medical or psychological condition at the time of the offenses to support his assertion that an investigation of an insanity defense might have been objectively reasonable." *Id*. Petitioner has not presented any evidence in these habeas proceedings, either. He therefore fails to show that his counsel was ineffective for failing to assert an insanity defense. *See Sneed v. Johnson*, 600 F.3d 607, 611 (6th Cir. 2010); *Abdur'Rahman v. Bell*, 226 F.3d 696, 715 (6th Cir. 2000). Under *Strickland*, it is Petitioner's burden to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

With respect to counsel's failure to raise a duress defense, the claim lacks merit because the Michigan courts repeatedly have held that duress is not a defense to homicide. *See Gimotty v. Elo*, 40 App'x 29, 32-33 (6th Cir. 2002) (citing cases). Petitioner's trial counsel therefore was not ineffective for failing to raise this defense. Moreover, as the Michigan Court of Appeals held in rejecting Petitioner's argument, a duress defense is similar to a self-defense claim in that both "require that the actor honestly and reasonably believe that he is in imminent danger of

death or great bodily harm." *Smith*, 2012 WL 164098, at *5. The Michigan Court of Appeals concluded that counsel's failure to pursue a duress defense did not prejudice Petitioner because the trial judge's reasoning for rejecting his self-defense claim demonstrates that she also would have rejected a claim that he acted under duress. *Id.*

Petitioner additionally argues that his trial counsel was ineffective for failing to raise a necessity defense. The Michigan Court of Appeals rejected this claim, reasoning that the defense applies only to situations involving natural physical forces and the record was "void of any evidence that defendant's conduct was the result of or influenced by a natural physical force." *Smith*, 2012 WL 164098, at *5. Because Petitioner did not have a viable necessity defense, as defined under Michigan law, his trial counsel was not ineffective in failing to raise this defense. *See Hawkins v. Rivard*, No. 16-1406, 2016 WL 6775952, at *5 (6th Cir. Nov. 10, 2016).

## C.     Petitioner's sentencing claim

In his fifth ground for relief, Petitioner contends that the trial court erred in scoring 25 points under Offense Variable 13 of the Michigan Sentencing Guidelines. Petitioner also argues that his trial counsel was ineffective for failing to object to the scoring of the guidelines and for failing to review the pre-sentence investigation report.

Petitioner's claim concerning the scoring or calculation of the State's sentencing guidelines is not cognizable on federal habeas review as it is a matter of state concern only. *See Marin v. Brewer*, No. 16-2420, 2017 WL 4677506, at *3 (6th Cir. Apr. 28, 2017) (citing *Howard v. White*, 76 F. App'x. 52, 53 (6th Cir. 2003); *Bradhshaw v. Richey*, 546 U.S. 74, 76 (2005)); *see also Kissner v. Palmer*, 826 F.3d 898, 904 (6th Cir. 2016) (providing that "errors in the application of state sentencing guidelines … cannot independently support habeas relief[.]").

With respect to counsel's alleged errors at sentencing, the Michigan Court of Appeals rejected Petitioner's claim, finding a factual basis for the scoring under Michigan law:

> [D]efendant asserts that defense counsel was ineffective for failing to object to the trial court's score of 25 points for offense variable (OV) 13. Under MCL 777.43(1)(c), OV 13 is scored at 25 points when "[t]he offense was part of a pattern of felonious criminal activity involving 3 or more crimes against a person." Further, "[f]or determining the appropriate points under this variable, all crimes within a 5-year period, including the sentencing offense, shall be counted regardless of whether the offense resulted in a conviction." MCL 777.43(2)(a). Defendant was charged with first-degree murder, two counts of assault with intent to murder, and felony-firearm, and thus, the trial court's assignment of 25 points was correct. In the absence of an error by the trial court in scoring OV 13, defense counsel was not ineffective because he was not required to make a futile objection. *People v. Thomas*, 260 Mich. App[.] 450, 457; 678 NW2d 631 (2004).

*Smith*, 2012 WL 164098, at *6. Because there was a factual basis for scoring the offense variable, Petitioner cannot established that counsel's failure to challenge

the scoring of his sentencing guidelines caused him prejudice. *See e.g. Coleman v. Curtin*, 425 F. App'x. 483, 485 (6th Cir. 2011).

As to Petitioner's claim based on counsel's alleged failure to review the pre-sentence investigation report or discuss it with Petitioner prior to sentencing, Petitioner is not entitled to relief because the claim is conclusory and unsupported. A review of the sentencing transcript reflects counsel's representation that he reviewed the pre-sentence investigation report both before sentencing and again at sentencing after the prosecutor indicated the sentencing guidelines should be lower than listed in the report. (4/5/10 Tr. at 2, 4, ECF No. 15-8 at Pg ID 701, 703.) Moreover, even if the Court assumed that trial counsel did not review the pre-sentence report, Petitioner fails to allege—much less show—prejudice resulting from counsel's alleged error. Accordingly, Petitioner is not entitled to habeas relief based on this ineffective assistance claim.

## IV.   Conclusion

For the reasons stated, the Court concludes that Petitioner fails to establish entitlement to habeas relief under 28 U.S.C. § 2254. In order to appeal this decision, Petitioner must obtain a certificate of appealability. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by

demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327.

Reasonable jurists could not debate the Court's assessment of Petitioner's claims, nor conclude that the issues deserve encouragement to proceed further. The Court therefore declines to issue a certificate of appealability. Nevertheless, because Petitioner was granted leave to proceed in forma pauperis in this Court, he may proceed in forma pauperis on appeal without further authorization. Fed. R. App. P. 24(a)(3)(A).

Accordingly,

**IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner may proceed in forma pauperis on appeal.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: July 16, 2018

27

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, July 16, 2018, by electronic and/or U.S. First Class mail.

s/ R. Loury
Case Manager